IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PHYSICIANS MUTUAL INSURANCE COMPANY and PHYSICIANS LIFE INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> ASSET ALLOCATION AND MANAGEMENT CO., LLC, <br><br> Defendant. | Civil Action No.: 06 C 5124 <br><br> Suzanne B. Conlon, Judge |

## MEMORANDUM OPINION AND ORDER

Physicians Mutual Insurance Company and Physicians Life Insurance Company ("Physicians") sue Asset Allocation and Management Co., LLC ("AAM") in this diversity case for injuries sustained as a result of AAM's alleged (i) professional negligence; (ii) breach of fiduciary duty; (iii) breach of contract; and (iv) fraud. AAM moves for summary judgment. For the reasons set forth below, AAM's motion is granted.

### BACKGROUND

The following facts are undisputed unless otherwise noted. This action arises out of purported losses relative to mortgage-backed investments that were recommended to Physicians by AAM, their former investment advisor. Physicians retained AAM as its investment advisor from October 1, 1983 through the relevant time period pursuant to consecutive Investment Management Agreements. Def. Facts ¶ 7. Under these agreements, AAM recommended securities for Physicians to purchase and sell, which AAM represented to be in Physicians' best interest. *Id.* ¶ 8. Physicians retained ultimate authority to execute trades. *Id.* Physicians claim

that AAM failed to conduct adequate due diligence on the investments and misrepresented the risks associated with them, thereby resulting in a loss of excess premium paid and income.

On AAM's recommendation, in 1996, 1999, and 2000, Physicians purchased participating interests in four separate pools of mortgage loans insured by the Federal Housing Administration ("FHA"). Def. Facts ¶ 9. The underlying mortgage loans were for the purpose of financing construction of multi-family, low income (HUD Section 8) or elderly housing projects under the National Housing Act. Physicians' interests represented direct ownership of the underlying mortgage loans, entitling them to a proportionate share of the principal and interest payments on those loans. The particulars of Physicians' investments are set forth in the following table:

| **Settlement Date** | **Purchaser** | **Project** | **Par Value** | **Purchase Price** | **Stated Maturity** | **Date Called** |
|---|---|---|---|---|---|---|
| 2/20/1996 | Physicians Mutual | Greystone 95-4 | 4,993,281.50 | 6,983,572.30 | 6/1/2024 | 5/29/2003 |
| 2/28/1996 | Physicians Life | Greystone 96-1 | 2,000,000.00 | 2,291,250.00 | 5/1/2018 | 9/25/2002 |
| 2/28/1996 | Physicians Mutual | Greystone 96-1 | 5,000,000.00 | 5,728,125.00 | 5/1/2018 | 9/25/2002 |
| 11/26/1996 | Physicians Life | Greystone 96-6 | 4,000,000.00 | 5,475,000.00 | 6/1/2024 | 5/28/2003 |
| 11/26/1996 | Physicians Mutual | Greystone 96-6 | 1,000,000.00 | 1,368,750.00 | 6/1/2024 | 5/28/2003 |
| 2/26/1999 | Physicians Life | Union Plaza | 2,956.641.39 | 3,585,389.66 | 7/1/2026 | Prepayment Lockout expired 4/1/06; extended again to 4/1/2013 |

2

| 2/26/1999 | Physicians Mutual | Union Plaza | 6,898,829.91 | 8,365,909.23 | 7/1/2026 | Prepayment Lockout expired 4/1/06; extended again to 4/1/2013 |
| 9/28/2000 | Physicians Mutual | Greystone 95-4 | 2,163,040.79 | 2,551.177.90 | 6/1/2024 | 5/29/2003 |

Pl. Facts ¶ 2. As noted in the table, Physicians purchased these mortgage-backed securities at a premium above par value. Physicians claims that it did so because AAM represented that "there existed 'call protection' or 'prepayment lockouts'. . . for either the full or a substantial part of the life of the underlying loans," which served to hedge risk that the investments would be paid off prior to stated maturity dates. Pls.' Second Amended Complaint ¶¶ 13-14 ("Compl."). Each of the Greystone loans contained prepayment lockouts for the lifetime of the loans; the Union Plaza loans also contained prepayment lockouts until 2006 (later extended to 2013). Def. Facts ¶¶ 15, 19. The lockout covenants for the three Greystone pools were obtained by Greystone Funding Corporation, the organizer of the pools, with the loan borrowers. Id. ¶ 15. Greystone Funding Corporation's sister company, Greystone Servicing Corporation, serviced the loans in those pools. Id. ¶ 17. The Union Plaza prepayment lockout covenants were obtained by the owner of Union Plaza and Warburg Dillon Read LLC, the entity that sold Physicians the Union Plaza loans. Def. Facts ¶ 19.

Notwithstanding the existence of the prepayment lockouts, the three Greystone pools were each called prior to their stated maturity, resulting in a payment to Physicians for their participating interests at par value. Pl. Facts ¶ 2. It is Physicians' contention that this payment prior to maturity resulted from the ineffectual prepayment lockouts investigated by AAM at the

outset of the transaction. Compl. ¶¶ 15-16. According to Physicians, the true nature of the prepayment lockouts was never properly disclosed by AAM. Had the true nature of the prepayment lockouts been disclosed, Physicians asserts that they would not have paid such a high premium for their participation interests, or would have never invested in the securities. Def. Facts ¶ 43. Physicians recovered all of its original investment, par value of the investment, and enough of the high interest coupon so that the investments (depending on the pool) earned an annualized return of between 5.83 and 6.22 percent. Def. Facts ¶ 40. Physicians claim a loss deriving from their overpayment on the participation interests and other consequential losses.

## Details Of The Greystone Pools

When Greystone Funding Corporation pooled the underlying mortgage loans, they paid an undisclosed amount to the borrowers for covenants not to prepay on their mortgages, which "enhanced Greystone's ability to market interests in the loans." Def. Facts. ¶ 16. These covenants were integral to the original pricing scheme of the investments. Peter Mavrogenes Dep. at 88:12-89:6.

In addition, when the Greystone pools originated, HUD's Section 8 housing assistance program provided rent subsidies sufficient to assure that the property owner could pay the mortgage. Def. Facts ¶ 10. These rent subsidies were paid pursuant to Housing Assistance Program (HAP) contracts, which typically lasted approximately twenty years. *Id.* ¶ 11. Loans in the Greystone 95-4 and 96-6 pools provided investors the right to a put option exercisable in a one year window upon the expiration of the HAP contracts, which AAM believed to be in the 2004 to 2005 time frame ("the put date"). *Id.* ¶ 21. The put feature gave Physicians the option to "put" the loans back to HUD in exchange for a government debenture, which would have been

4

attractive if the current interest rates rose to a level exceeding the yields on the underlying loan pools. Pl. Facts ¶ 5. This was significant because prior to Physicians' investment, yields on the investment up until the put date were quoted to Jerry Coon, Physicians' Senior VP of Finance during a telephone call with Lawrence Zeno of AAM. Def. Facts ¶¶ 25-27. Coon nevertheless acknowledged that the investments had a default risk and did not believe that AAM guaranteed a particular yield or return. *Id.* ¶¶ 33, 63.

From the record, it is unclear whether the investments could have been negotiated for a lower price than Physicians paid. Pl. Facts ¶ 10. AAM purportedly made its investment recommendation based on prices that would provide a yield up to the put date (for the 95-4 and 96-6 loans) or average life (for the 96-1 loans) of the loans, ranging from the end of 2004 to the end of 2007. Def. Facts ¶¶ 28-29. These quoted yields exceeded the yields over a similar time period on Treasury securities. However, because the investments were called prior to the put date, Physicians did not realize these yields. Instead, Physicians recovered a return of the original investment, 100 percent par value, and an annualized return of between 5.83 and 6.22 percent, which surpassed Treasury security yields over the same time period. *Id.* ¶¶ 40-41.

**Circumstances Leading Up To the Call of Physicians' Investments in 2002 and 2003**

Just prior to paying Physicians out on its investment, Greystone Servicing Corporation assigned each of the underlying loans to USGI, Inc.; some loans were then reassigned again to Greystone Servicing Corporation. *Id.* ¶ 45. Greystone Servicing Corporation issued participation certificates for some of the underlying loans to another entity, Jet Premier Investments, LLC. *Id.* ¶ 46. Each of these transactions occurred while Physicians' interests were still outstanding. Based on these transactions, AAM's expert Douglass Sher opined that

5

Physicians' interests were actually terminated due to a sale of the underlying mortgage loans to another entity, rather than prepaid by borrowers due to HUD's new Section 8 program ("the Mark-to-Market program"). *Id.* ¶¶ 50-52. Sher's report did not address conflicting testimony by Greystone witness Robert Barolak that Greystone consented to prepayments by borrowers who indicated an intent to prepay. Pl. Facts ¶ 19. Barolak testified that assignments to USGI, Inc. were conducted in connection with a refinancing of the underlying loans. Robert Barolak Dep. (5/24/07) at 112:5-113:12.

### Physicians' Damages Calculation

Based on the allegation that AAM failed to investigate and apprise Physicians of the true nature of the prepayment risks in the underlying loans, Physicians' expert Don Coker quantified Physicians' losses to be (1) $2,223,222.34 in overpaid premiums for the original investments; (2) $1.422,859.14 in lost income from the overpaid premium from the purchase date to the date of his report (June 11, 2007); (3) $2,110,608.46 in lost income (from reinvesting the returned principal in 2002/2003) from the date the investments were called to the date of the report; and (4) $5,634,232.83 as the net present value of lost income (from reinvesting the returned principal in 2002/2003) from the date of the report until the stated maturity dates. Pl. Facts ¶¶ 21-23.

AAM argues that (1) Physicians' have not suffered any actual loss as a matter of law; (2) Physicians cannot prove that AAM caused any loss; (3) the breach of contract and breach of fiduciary duty claims should be dismissed because they are duplicative of the professional negligence claim; and (4) the fraud claim should be dismissed because there is no evidence of fraudulent intent. Physicians respond that (1) they have suffered a loss by virtue of their premium overpayments and consequential damages; (2) there is a genuine issue of fact as to

whether AAM caused Physicians' loss; (3) Fed. R. Civ. P. 8(e)(2) permits alternative theories of liability; and (4) there are still genuine issues of fact regarding whether AAM acted with fraudulent intent. Both parties submit affidavits and deposition transcripts of witnesses and experts, as well as volumes of exhibits, including documents pertaining to the underlying investments.

Physicians have not suffered any legally compensable loss. Accordingly, summary judgment is appropriate. The remaining arguments need not be addressed.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Cox v. Acme Health Serv., Inc.*, 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). The movant has the burden of establishing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the non-movant must set forth specific facts demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the

burden of proof at trial." *Celotex*, 477 U.S. at 322; *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). A scintilla of evidence in support of the non-moving party's position is not sufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 250.

## II. Physicians' Purported Losses

AAM asserts that because Physicians have not suffered any actual loss from the underlying investments, they are precluded from recovery. Their principal contention is that Physicians have actually profited from the investments, and Physicians' claim for additional benefit-of-the-bargain/expectation damages are unrecoverable under any of their liability theories. Physicians counter that their losses are not in the form of benefit-of-the-bargain/expectation damages, but are losses deriving from overpaying on premiums and other consequential damages stemming from the loss of income due to the premature call of the investments. Physicians' claims fail under Illinois law because they have not suffered any net damages.

As this is a diversity case, Illinois substantive law applies to Physicians' claims. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Physicians must show they have incurred an actual loss on each of their claims. *Avery v. State Farm Mut. Auto Ins. Co.*, 216 Ill. 2d 100, 149, 835 N.E.2d 801, 832 (Ill. 2005) (citing *Econ. Fire & Casualty Co. v. GAB Bus. Servs, Inc.*, 155 Ill. App. 3d 197, 201, 507 N.E.2d 896 (Ill. App. Ct. 1987).[1] Without actual loss, a plaintiff has no damages.

---

[1]The economic loss doctrine, known in Illinois as the Moorman doctrine, precludes tort liability if the plaintiff suffers purely economic losses. *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1982). However, the doctrine does not apply because Physicians' purported damages are alleged to have been caused by AAM's intentional false representations, fraud, or negligent misrepresentation in supplying investment information to Physicians. *In re Chicago*

8

*See Disher v. Information Resources, Inc.*, 691 F. Supp. 75, 84 (N.D. Ill. 1988) (Hart, J.) (no loss or damages arising out of federal securities claim and breach of fiduciary duty claim where plaintiff actually profited from underlying investment).

Physicians assert common law claims. However, the parties principally rely on federal securities law. *Madigan, Inc. v. Goodman*, 498 F.2d 233 (7th Cir. 1974) does not have a direct bearing on whether Physicians have suffered any damages under Illinois law. *Id.* at 237 (declining to address plaintiff's Illinois common law fraud count because the parties did not brief the issue).[2] In assessing damages for common law fraud claims, Illinois courts generally apply "benefit-of-the-bargain" damages: the difference between the actual value of the property sold and the value the property would have had if the representations had been true at the time of sale. *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 758-62, 625 N.E.2d 990, 998-1000 (Ill. App. Ct. 1993); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 196, 538 N.E.2d 530, 537-38 (Ill. 1989); *but see Lee v. Heights Bank*, 112 Ill. App. 3d 987, 998, 446 N.E.2d 248, 256 (Ill. App. Ct. 1983) (applying out-of-pocket loss rule); *Brown v. Broadway Perryville Lumber Co.*, 156 Ill. App. 3d 16, 25, 508 N.E.2d 1170, 1176-77 (Ill. App. Ct. 1987) (same); *Bear Stearns & Co., v. Sitlington III*, No. 97 C 4878, at *2, 3 (N.D. Ill. Sept. 29, 2000) (Levin, M.J.) (same).

---

*Flood Litig.*, 176 Ill.2d 179, 199, 680 N.E.2d 265, 275 (Ill. 1997) (citations and emphasis omitted).

[2]Nonetheless, application of Illinois law results in the same outcome as under federal securities law and *Madigan*, 498 F.2d at 233. Under *Madigan*, a plaintiff is not entitled to the full benefit of his bargain, that is, the profitable yields promised in a security transaction. Out-of-pocket losses (plus interest or the "lost alternative use" of the funds proved to a good deal of certainty) incurred by the plaintiff in the purchase a security are recoverable. Physicians have suffered no legally cognizable losses because they recovered their out-of-pocket losses through the course of their investment, and they have recovered the lost alternative use of the investment by virtue of the yields that they realized up to the date the investments were called.

The rule is based on the theory that a defrauded party is entitled to the benefit of his bargain in a transaction and should be placed in the same position that he would have occupied had the false representations on which he acted been true. *Schwitters v. Springer*, 236 Ill. 271, 274 86 N.E. 102 (Ill. 1908); *Johnson v. Niles Invisible Door Check Co.*, 222 Ill. App. 65 (Ill. App. Ct. 1921). Notably, this rule has been applied to the purchase of investment instruments such as stocks and notes. *Id.* (notes); *Chesrown v. Black*, 155 Ill. App. 422 (Ill. App. Ct. 1910) (stocks); *Hazelton v. Carolus*, 132 Ill. App. 512 (Ill. App. Ct. 1907) (stock); *Stewart v. Clark*, 194 Ill. App. 2 (Ill. App. Ct. 1915) (notes).

Physicians contend their losses – regardless of any profits they received – stem from three different theories: (1) an overpayment on the investments due to AAM's misrepresentation regarding the prepayment lockouts; (2) lost income on the lost overpayment; and (3) lost income on alternative yields that they could have been realized during the same period AAM "promised" the investments would remain intact. The issue is whether these purported losses are recoverable under Illinois law.

Physicians' undisputed recovery of 100 percent par value of the investment, the premium amount, and profitable returns have a significant bearing on the analysis of whether their purported losses are recoverable, as they serve to mitigate any net loss sustained by Physicians. *See, e.g., Disher*, 691 F. Supp. at 79, 84 ("all profits and losses occur[ing] after the fraud [and breach of fiduciary duty] must be netted against each other"); *see generally FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 623 (7th Cir. 1989) (damages must take into account payments already received by the plaintiff). Therefore, each of Coker's damages calculations must be analyzed with respect to the amount that Physicians gained from the investments.

10

First, with respect to the alleged overpayment, estimated by Coker to be in the sum of $2,233,222.34, any loss of an excess premium is not a compensable loss (for a fraud claim) under Illinois law because the entire premium payment was recovered by Physicians. Particularly instructive is *Schwitters*, 236 Ill. at 274, where the Illinois Supreme court affirmed (and applied) the benefit-of-the-bargain rule to a plaintiff's fraud claim on notes he acquired from the defendant. The notes were sold for $1,000 each to the plaintiff, and bore an interest of 7% after maturity. *Id.* The notes were later found worthless, yielding no profit or income whatsoever. The court held that the investor was entitled to the difference between the real value of the instrument and the represented value when it was sold to the investor. *Id.* Significantly, the court noted that although the notes promised a 7% interest rate after maturity, the plaintiff could not recover this unrealized promised interest; as the compensable loss pertained only to the loss at the time of sale, with interest accruing until trial. *Id.*

If Physicians recovered nothing at all on their investments as in *Schwitters*, the compensatory damages Physicians would be entitled to recover for fraud would be the purchase price of the instruments, that is, the difference between the value of the investments and their represented value. *Id.* Physicians have recovered the purchase price (which includes the price of the premiums) *and* profited more than they would have if they invested in Treasury notes over the same time period. Def. Facts ¶ 41.

Second, with respect to Physicians' argument that they lost income from the alleged overpayment, approximately $1,422,859.14 – calculated by Coker from the settlement date to the date of his report, also is unpersuasive. Whatever yield Physicians could have realized on the excess premium until the call date was recovered in the profits returned on the entire value of the

11

investments. Any lost income after the call date constitutes speculative losses. Prior to the call date, Physicians argues that it lost income from the overpayment until the call date. However, the underlying loans remained in place long enough so that the high interest coupon yielded an annualized return of between 5.83 and 6.22 percent, exceeding the yield for Treasury securities over the same time period. Def. Facts ¶ 41. Physicians received income from the overpayment at a rate of interest commensurate to any reasonable alternative investment Physicians could have made with that sum.

As for income lost on the alleged overpayment after the call date, the question is whether those sums constitute consequential losses. Physicians contend they are entitled to income as a consequential loss because it represents "additional earnings" that could have been realized if the overpayment was invested differently. *See* Pl. Mem. at 8. The problem with this assertion is that it assumes that earnings were guaranteed after the call date, but there is no record supporting such a conclusion. The investment essentially contemplated the loss from the outset. "Nearly all securities, save federal government debt securities, contain a certain degree of risk." *Master, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 734 & n.6 (4th Cir. 1990). Here, the securities themselves had an inherent risk that Physicians would not recover the yields promised by Physicians. Physicians' Jerry Coon testified that AAM did not guarantee a particular yield or return, Def. Facts ¶ 63, nor did he contest that the underlying investments had a default risk. *Id.* ¶ 34. The spread between the yields on the investment and other hedged investments reflect that a risk of a premature call was contemplated. Thus, Physicians' contention that it is entitled to lost income from an overpayment after the call date is premised on the theory that they lost income that was not guaranteed to them. Common law fraud claims involving investments do

12

not extend liability based on "the expected fruits of an unrealized speculation." *Smith v. Bolles*, 132 U.S. 125, 129-30 (1889); *see also Madigan*, 498 F.2d at 239 (citing *Smith*). Although it was not expected at the outset that Physicians' investments would be called prematurely, that risk was clearly contemplated. Therefore, any loss of income after the call date constitutes "expected fruits of unrealized speculation" unrecoverable for claims of common law fraud. *See generally Schwitters*, 236 Ill. at 274 (refusing to award damages for the promised interest rate that was unrealized after the underlying notes matured); *Wafra Leasing Corp. v. Prime Capital Corp., et al.*, 339 F. Supp. 2d 1051, 1055-56 (N.D. Ill. 2004) (St. Eve, J.) (disallowing plaintiff investors damages of future, expected income from defendant auditors for federal securities law claims and negligent misrepresentation claim).

Third, the same analysis is pertinent to whether Physicians is entitled to lost income deriving from the premature call of the investments, estimated by Coker to be $7,744,841.29. Physicians claim they are entitled to "consequential loss resulting from having to reinvest its returned principal at lower prevailing interest rates," because the investments were intended to be "long term and provide a cash flow to the maturity date of each of the underlying loans." Pl. Mem. at 8. However, whether this amount can be considered a consequential loss depends on whether the investments were guaranteed to make the stated yields. There is no evidence in the record to support this contention. But there is evidence that risk of the investment being called prior to maturity was contemplated by Physicians. Def. Facts ¶¶ 34, 63. Thus, any losses from reinvestment of the returned principal at a lower rate is not a compensable nor a consequential loss, as the early call was inherent in the investment risk. Physicians' characterization of the income as a "lost alternative use" of the investments is also unavailing. The investments yielded

a return up to the call date that exceeded those of Treasury securities. Def. Facts ¶ 41. And, as discussed more fully above, purported losses sustained after the call date are merely unrecoverable "fruits of unrealized speculation." *Smith*, 132 U.S. at 129-30; *see also Schwitters*, 236 Ill. at 274.

Physicians have not suffered an actual loss on their claims of professional negligence, breach of contract, and breach of fiduciary duty, which are based on the same facts and injury as the fraud claim. Nevertheless, compensable losses under these claims would render the same result. For example, damages available for claims of negligent misrepresentation are based on the difference between the value received in the transaction and its purchase price or other value given, and consequential damages. Restatement (Second) of Torts § 552B (1977); *see also* Restatement (Second) of Torts § 903 ("[w]hen there has been harm only to the pecuniary interests of a person, compensatory damages are designed to place him in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed").

Under this out-of-pocket loss rule, Physicians would be entitled to recover overpayment losses. However, that amount has been recovered, because Physicians has recovered the entire purchase price of their original investment plus interest. Additionally, Physicians' argument that they are entitled to lost income from the entire purchase price as a consequential loss is also unavailing. The claimed lost income is based on future expectation rather than consequential losses, as the underlying investments were not guaranteed investments. *See, e.g., Wafra*, 339 F. Supp. 2d at 1055-56. Physicians admit they profited from their investments up until the call date. Def. Facts ¶ 40. Any claim for subsequent losses are based on Physicians' unrealized

expectation that the investments would yield more money and stay in place for a longer duration. However, the stated yields were not guaranteed as a contractual right. Therefore, Physicians' claim for lost income after the call date would constitute expectation damages that are unavailable for securities claims involving negligent misrepresentation. *See, e.g., Wafra*, 339 F. Supp. 2d at 1055-56 (expectation of receiving future payments unavailable to plaintiffs under federal securities law and negligent misrepresentation claims because plaintiffs did not bargain for future payments from defendant auditors).

Finally, the out-of-pocket loss rule is applicable to claims for professional negligence and breach of fiduciary duty. *See, e.g., Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 224 Ill. App. 3d 559, 609 586 N.E.2d 600 (Ill. App. Ct. 1991), *affirmed*, 159 Ill. 2d 137, 636 N.E.2d 503 (Ill. 1994) (professional negligence); *Bear Stearns*, 2000 WL 1468740, at *2, 3 (breach of fiduciary duty and fraud); *Disher*, 691 F. Supp. at 84 (breach of fiduciary duty). Because Physicians recovered all of their purchase price and profited at a favorable alternative interest rate, they have not suffered an actual loss under these claims. Additionally, Physicians contention that they are entitled to lost income after the call date is also unavailing as these amounts would be considered unrealized profits that are unrecoverable. *See, e.g., Bear Stearns*, 2000 WL 1468740, at *2, 3; *Disher*, 691 F. Supp. at 84.

## **CONCLUSION**

Because Physicians recovered the entire purchase price and interest on their original investment, they have not suffered a legally cognizable loss under any of their liability theories. Accordingly, AAM's motion for summary judgment is granted.

ENTER:

September 28, 2007

Suzanne B. Conlon
United States District Judge